

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00101-CR

DAMMOND DEFFERAL JOHNSON                                        APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

-----------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
TRIAL COURT NO. 13-00441

----------

## MEMORANDUM OPINION[1]

----------

In two issues, Appellant Dammond Defferal Johnson appeals his conviction for aggravated robbery. Tex. Penal Code Ann. § 29.03 (West 2011). We affirm.

## I. Background

In September 2013, Alberto Gonzalez and his wife of 22 years, Jacqueline Bautista, were in the process of remodeling a home they owned in Gainesville,

---

[1]*See* Tex. R. App. P. 47.4.

Texas. On Sunday, September 8, 2013, Gonzalez was working on the Gainesville house, and Bautista was in Dallas. When Gonzalez stopped answering or returning Bautista's phone calls, she drove to Gainesville from Dallas to check on him. Once she got to the house, Bautista discovered her husband's dead body inside.

Gonzalez had been hog-tied with electrical cords and yellow tubing, with an electrical cord wrapped around his neck and a black plastic bag tied around his head. There was a laceration on the back of his head. At trial, the medical examiner testified that Gonzalez died of "[h]omicidal violence, including ligature strangulation, positional asphyxia, suffocation, and blunt trauma."

Sergeant Chris Garner of the criminal investigations division of the Gainesville Police Department was the lead investigator of Gonzalez's murder. Within a few days of the murder, Sergeant Garner located their first suspect, Fabian Cervantez, who had been using Gonzalez's credit cards. Sergeant Garner also determined that a shoeprint left at the scene of the murder was consistent with a shoe Cervantez wore. From his discussions with Cervantez, he learned that Cervantez was at the Thackerville Gaming Center with Appellant and Appellant's then girlfriend, Marcy Hunt, on the morning of September 8, 2013.[2] As a result of the investigation, Cervantez, Appellant, and Hunt were arrested. Appellant was charged with capital murder in December 2013.

---

[2]Surveillance video recorded by the gaming center showing Cervantez, Appellant, and Hunt meeting at the center was admitted into evidence at trial.

Hunt, who also had been charged with capital murder in connection with Gonzalez's death and had been in jail since October 2013, testified at trial. She testified that she did not have a plea agreement with the district attorney's office and had not been offered anything in exchange for her testimony. She additionally testified that she had a currently pending charge for possession of a controlled substance from February 2013 and that no plea agreement had been reached in that case either.

According to Hunt, she was at the gaming center with Cervantez and Appellant around 10:00 a.m. on September 8, 2013. Appellant and Hunt had driven to the gaming center in her car and later left with Cervantez in Hunt's car. Hunt and Appellant drove Cervantez to his home and dropped him off. The two then drove to Appellant's mother's house, but remained there only for a few minutes until Cervantez contacted them again. They then returned to Cervantez's home to pick him up so that they could drive to Gonzalez's house in Gainesville to purchase drugs.[3]

According to Hunt, while en route to Gonzalez's house, the three smoked methamphetamine,[4] and Cervantez and Appellant discussed robbing Gonzalez

---

Surveillance video from the same gaming center also showed Cervantez returning to the gaming center in Gonzalez's Toyota pickup truck later in the day.

[3]Hunt described Gonzalez as a friend of Cervantez's.

[4]Hunt testified that she had been a drug addict for approximately 20 years.

3

for drugs and money. But Hunt testified that none of them ever mentioned killing Gonzalez.

Hunt testified that when they arrived at Gonzalez's house, she stayed in the car until Appellant waved at her, signaling for her to come into the house. Hunt testified that when she went inside the house, Gonzalez was already on the floor and that Cervantez was tying him up and speaking with him in Spanish. Although she did not know what either of them was saying, she testified that Gonzalez was scared. According to Hunt, although Appellant was carrying a gun, he did not participate in tying up Gonzalez. Instead, Appellant was in the bedroom searching through drawers for drugs.

Hunt testified that before she and Appellant left Gonzalez's house, Gonzalez said something that upset her, so Appellant struck him in the head with an unopened wine bottle. Despite this blow, according to Hunt, Gonzalez was still alive and talking when they left the house.

When asked by Appellant's counsel on cross-examination if she hoped that her testimony in this case would earn her a "better deal [from the district attorney] than dying in prison," she shrugged her shoulders and replied, "Yes." Appellant's counsel also questioned Hunt about a February 2013 arrest for possession of a controlled substance that had never been prosecuted. When he asked Hunt, "So what did you do for Detective Jones [the detective in charge of the February 2013 offense investigation] in order to convince him to just let you go free without putting up a bond, and never get the case filed for seven

4

months?" the prosecution lodged a relevancy objection. Appellant's counsel responded, "I think she just worked a deal with the State and Detective Jones and nobody has told us about it." After a brief discussion with the attorneys, the trial court permitted Appellant's counsel to ask Hunt the following question:

> Q: Did you ever work a deal with Detective Jones about being a snitch or giving him information so that he would let you go, and not file this case on you from February?

Hunt answered, "Yes."

After Hunt's answer, the judge excused the jury from the courtroom and conducted a hearing on the matter. During the hearing, Appellant's counsel argued that the State violated the discovery rules because it was obligated to tell Appellant "if a witness is a snitch or has been a snitch." Without conceding that Hunt was a "snitch," the prosecutor asserted that there was no agreement between the State and Hunt "concerning her testimony in this case" and that no deal had ever been made to not prosecute the February 2013 drug offense.

Appellant's counsel then requested a continuance until the State turned over "all the records of her being a snitch, including payments, who she snitched on, when she snitched on them, is she still doing it, is she snitching in the jail." Alternatively, Appellant's counsel requested a mistrial. The trial court denied the motion for mistrial, but ordered that Detective Jones be made available after hours that evening to provide Appellant's counsel an opportunity to speak with him and to review "whatever records" the Gainesville Police Department had.

5

Appellant's counsel insisted that this placed an undue burden on him and prevented his client from receiving a fair trial. On the record, but still outside the presence of the jury, Hunt testified to the following:

[Appellant's counsel]: How long did you snitch to work off your case for Detective Jones?

A: I just agreed to talk to him, that's it. That's why he lowered my bond.

Q: Okay. When you said you agreed to talk to him, what do you mean by that?

A: Like I—he wanted me to call him when I got out.

Q: And did you do so?

A: Yes.

Q: Well, how many times?

A: Just once.

Q: And so you have done . . . nothing else for Detective Jones?

A: No. No.

Q: And you hadn't worked on a case, you hadn't told him about anybody else?

A: No.

Q: Have you told him anything about [Appellant]?

A: No.

Q: When . . . [you] made that one phone call, did you talk to him about [Appellant]?

A: No. I don't remember.

Q: But you could have?

6

A:    I could have.

Q:    . . . So how often do you talk to him?

. . . .

A:    I don't talk to him often at all.

Appellant's counsel met with Detective Jones that evening. The following morning, Appellant's counsel reported to the trial court that while he had a sufficient amount of time to meet with Detective Jones, he had not had a sufficient amount of time to investigate Hunt's work with the police department because "[t]hat would take a lot more time than a 15-minute conversation with Detective Jones." He admitted that he had also obtained a copy of Detective Jones's notes from his conversation with Hunt.

An audio recording of a January 2014 interview between Sergeant Garner and Appellant was admitted into evidence and played for the jury. In it, Appellant repeatedly insisted that he did not kill Gonzalez and did not see him die. Appellant's version of the events of September 8, 2013, was similar to Hunt's testimony at trial. Appellant described how he and Hunt had mentioned to Cervantez that they were looking for drugs—specifically, marijuana and methamphetamine—and Cervantez told them he could get marijuana from Gonzalez. According to Appellant, the three then agreed that Appellant and Hunt would pick up Cervantez later that evening and drive to Gonzalez's house to buy marijuana.

Appellant's statement differed from Hunt's testimony, however, when he described the events that occurred once the trio arrived at Gonzalez's house. According to Appellant, Gonzalez let Hunt and Cervantez into the house, but would not let Appellant in. And, according to Appellant's account, it was he—not Hunt—who observed Cervantez hog-tying Gonzalez and speaking to him in Spanish when he entered the house. Appellant further insisted that he refused to touch Gonzalez and told Cervantez as much. When asked how Cervantez managed to get Gonzalez to the floor on his own, Appellant told him that Hunt— not Appellant—had a gun and that Cervantez ordered her to point it at Gonzalez while he demanded that Gonzalez get on the ground.

Consistent with Hunt's testimony, Appellant stated that he and Hunt looked for drugs in the house and found marijuana. Appellant also admitted that he struck Gonzalez once on the head with a "20 ounce Coke, Dr. Pepper can, Bud Light, soda thing [Appellant] had in [his] hand." And, like Hunt, Appellant claimed that Cervantez was still tying up Gonzalez and that Gonzalez was on the floor but still alive when he left the house.

The jury found Appellant guilty of the lesser-included offense of aggravated robbery and sentenced him to 38 years' confinement.

## II. Discussion

### A. Brady issue

In his first issue, Appellant complains that the trial court erred by denying his request for a mistrial based on the State's failure to disclose to Appellant his

8

codefendant's status as a confidential informant to the Gainesville Police Department.  Appellant argues that this failure by the State violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963).

We review the denial of a defendant's motion for mistrial for an abuse of discretion.  *Whitney v. State*, 396 S.W.3d 696, 703 (Tex. App.—Fort Worth 2013, pet. ref'd).  A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to guiding principles.  *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

A defendant's due process rights are violated if he does not obtain, upon request, evidence in the State's possession favorable to him "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87, 83 S. Ct. at 1197.  "To invoke *Brady*, the accused must present evidence that: (1) the prosecution suppressed or withheld evidence; (2) this evidence would have been favorable to the accused; and (3) this evidence would have been material to the accused's defense."  *Cruz v. State*, 838 S.W.2d 682, 685 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (citing *Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S. Ct. 2562, 2568 (1972)).  *Brady* evidence includes impeachment evidence as well as exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985).

The State argues that there was no evidence to disclose because there was no agreement that Hunt would work for the police department as an

9

informant.[5] Hunt's testimony that she and Detective Jones agreed to a bond reduction in her drug case in exchange for her agreement to "talk to him" provides some evidence to the contrary, although the nature and degree of any such deal is unclear in the record. But before we consider whether this evidence constituted impeachment evidence that would have been favorable to Appellant, we will first determine whether the evidence would be material.

Evidence is material if "there is a reasonable probability that, [had the evidence been disclosed], the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S. Ct. at 3383. Thus, "[t]he mere possibility that an item of undisclosed information might have aided the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 98, 96 S. Ct. 2392, 2395 (1976).

Appellant contends that the evidence was material because "Hunt's eyewitness testimony was the key piece of the [S]tate's case; and a key piece to Appellant being found guilty of *aggravated* robbery." Appellant argues that "[h]er

---

[5]We note that it is the prosecutor's duty to learn of *Brady* evidence known to others acting on the state's behalf in a particular case, such as the police, *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006), and it is our duty to scrutinize allegations of *Brady* violations, *see generally Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989) (noting that a reviewing court "should be concerned with the integrity of the process leading to the conviction"), *disagreed with in part on other grounds by Snowden v. State*, 353 S.W.3d 815, 821–22 (Tex. Crim. App. 2011).

credibility is what turned a robbery into an aggravated robbery for Appellant" because without her testimony, the jury would not have had any evidence that Appellant caused the victim any bodily injury. We disagree.

A person commits aggravated robbery if, in the course of committing theft, he causes serious bodily injury to another or uses or exhibits a deadly weapon. Tex. Penal Code Ann. § 29.03(a). The jury heard the audio recording of Appellant's conversation with Sergeant Garner, in which Appellant confessed that he struck Gonzalez in the head with some kind of bottle or can. The jury also heard testimony from the medical examiner that Gonzalez had "a laceration, which is a tear due to blunt trauma, on the back of his head."[6] While Appellant's statement and Hunt's testimony at trial did not match exactly—the two disagreed as to who initially entered the house with Cervantez and who carried a gun,[7] for

---

[6]The medical examiner testified that the 1.25-inch laceration on the back of Gonzalez's head caused hemorrhaging underneath the scalp. When asked if the laceration and hemorrhaging indicated anything about the force of the trauma sustained by Gonzalez, she responded that "it's significant to tear your scalp." According to the medical examiner, Gonzalez died of "homicidal violence, including ligature strangulation, positional asphyxia, suffocation, and blunt trauma." While the medical examiner did not testify that the blunt trauma was significant enough to cause the death on its own, she observed that the "blunt trauma to the head with a laceration or tear, and hemorrhage of the scalp [was] certainly not helping [Gonzalez] any."

[7]Both Appellant and Hunt stated that a gun was used, or at least exhibited, when Gonzalez was forced onto the floor, and Appellant admitted that he knew Hunt had a gun when she went into Gonzalez's house. Even disregarding Hunt's testimony altogether, if the jury found that Appellant knew Hunt was going to use or exhibit a deadly weapon, such as a firearm, during the course of the robbery, he could be found guilty of aggravated robbery under the law of parties. *See* *Young v. State*, 428 S.W.3d 172, 178 (Tex. App.—Houston [1st Dist.] 2014, pet.

11

example—they both agreed on two key points: (1) that both Hunt and Appellant were on a mission to steal drugs from Gonzalez and (2) that while Gonzalez was still alive, Appellant delivered a blow to his head with some kind of bottle or can. Thus, even excluding all testimony by Hunt that contradicted Appellant's statement, his statement to Sergeant Garner alone was sufficient to "turn a robbery into an aggravated robbery."[8]

Furthermore, in determining whether the evidence is material, the question is whether the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995). Here, Appellant's statements in the interview and Hunt's testimony sufficiently correlate such that impeachment

_____

ref'd) (holding that evidence was sufficient to support aggravated robbery conviction where appellant admitted that he knew his friend had a gun, heard the release of the safety on the gun, and saw one of his friends display the gun to threaten the complainant); *Hurd v. State*, 322 S.W.3d 787, 793 (Tex. App.—Fort Worth 2010, no pet.) (holding that the trial court did not err in including a deadly-weapon finding in the judgment where the law of parties required the jury to find that appellant knew that a deadly weapon would be used in the commission of murder); s*ee also* Tex. Penal Code Ann. § 7.01(a)-(b) (West 2011) (providing that a person is criminally responsible for another's conduct if the offense is committed by his own conduct, another's conduct for which he is criminally responsible, or both parties' conduct, and each party to the offense may be charged with commission of the offense); *id.* § 7.02(a)(2), (3) (West 2011) (providing that a person is criminally responsible for another's conduct if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person in committing the offense or, having a legal duty to prevent commission of the offense, he fails to make a reasonable effort to prevent commission of the offense).

[8]Appellant does not contest the sufficiency of the evidence to support a finding that the blow to Gonzalez's head caused serious bodily injury.

evidence of a deal between Hunt and the State would not have put the case in a different light so as to undermine confidence in the conviction for aggravated robbery. Appellant has failed to carry his burden to show that any alleged evidence that Hunt was acting as an informant was material. *See Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383. We therefore overrule Appellant's first issue.

**B. Punishment**

In his second issue, Appellant argues that his punishment of 38 years' confinement violates the Eighth Amendment's prohibition of cruel and unusual punishment. The State argues that Appellant failed to preserve this issue.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). Generally, an appellant may not complain about his sentence for the first time on appeal. *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995); *Mercado v. State*, 718 S.W.2d 291, 296 (Tex. Crim. App. 1986); *Means v. State*, 347 S.W.3d 873, 874 (Tex. App.—Fort Worth 2011, no pet.); *Laboriel-Guity v. State*, 336 S.W.3d 754, 756 (Tex. App.—Fort Worth 2011, pet. ref'd).

Appellant did not object to the length of his sentence when he was sentenced by the trial court, nor did he present his complaint regarding the length of his sentence in his motion for new trial. By failing to do so, he did not preserve

his complaint. *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (holding complaint of cruel and unusual punishment was waived because defendant presented his argument for first time on appeal); *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding that appellant did not preserve his complaint that sentence was disproportionate when he did not raise it at the time it was imposed or in a motion for new trial). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).[9] We therefore overrule Appellant's second issue.

### III. Conclusion

Having overruled both of Appellant's issues, we affirm the judgment of the trial court.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

---

[9]Even if properly preserved, this argument would have no merit because Appellant's 38-year sentence was well within the range of applicable punishments for a first-degree felony and was not grossly disproportionate to the underlying offense, considering the facts, which involved the invasion of Gonzalez's home, and the assault, robbery, and gruesome murder of Gonzalez. *See* Tex. Penal Code Ann. §§ 29.03(b), 12.32 (West 2011); *Moore v. State*, 54 S.W.3d 529, 543 (Tex. App.—Fort Worth 2001, pet. ref'd) (holding that life sentence was not disproportionate to offense because it was within the range of applicable punishments); *Puga v. State*, 916 S.W.2d 547, 550 (Tex. App.—San Antonio 1996, no pet.) (noting that appellant would be eligible for parole in holding that sixty-five year sentence for delivery of a controlled substance was not disproportionate).

PANEL:  GARDNER, WALKER, and SUDDERTH, JJ.

WALKER, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 25, 2016